BRAND X INTERNET SERVICES,
Petitioner,

v.

FEDERAL COMMUNICATIONS
COMMISSION, Respondent.

Earthlink, Inc., Petitioner,

SBC Communications, Inc., Intervenor,

v.

Federal Communications Commission,
Respondent.

Verizon Telephone Companies, Verizon
Internet Solutions d/b/a Verizon.Net,
Petitioner,

SBC Communications, Inc., Intervenor,

v.

Federal Communications Commission,
Respondent.

Consumer Federation of America;
Consumers Union; Center for Digital Democracy, Petitioners,

v.

Federal Communications Commission,
Respondent.

People of the State of California; Public Utilities Commission of the State of California, Petitioners,

v.

Federal Communications Commission; United States of America, Respondents.

National League of Cities; National Association of Telecommunications Officers and Advisors; United States Conference of Mayors; National Association of Counties; Texas Coalition of Cities for Utility Issues, Petitioners,

v.

Federal Communications Commission, Respondent.

Conestoga Township; Providence Township; Martic Township; Buckingham Township; East Hempfield Township, Petitioners,

v.

Federal Communications Commission, and United States of America, Respondents.

Nos. 02–70518, 02–70684 to 02–70686, 02–70879, 02–71425 and 02–72251.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 8, 2003.

Filed Oct. 6, 2003.

Harvey L. Reiter, Stinson Morrison Hecker LLP, Washington, DC, argued the cause for petitioner Brand X Internet LLC and filed briefs.

John W. Butler, Sher & Blackwell, LLP, Washington, DC, argued the cause for petitioner EarthLink and filed briefs, and David N. Baker, EarthLink, Inc., Atlanta, GA. Earl W. Comstock and Alison Macdonald, Sher & Blackwell, also were on the briefs.

Ellen S. LeVine, California Public Utilities Commission, San Francisco, CA, argued the cause for petitioner State of California and submitted briefs. Gary M. Cohen and Lionel B. Wilson also were on the briefs.

Frederick A. Polner, Rothman Gordon, P.C., Pittsburgh, PA, argued the cause for petitioners Pennsylvania Townships and submitted briefs.

Tillman L. Lay, Miller, Canfield, Paddock and Stone, P.L.C., Washington, DC, argued the cause for petitioners National League of Cities, National Association of Telecommunications Officers and Advisors, United States Conference of Mayors, National Association of Counties, and Texas Coalition of Cities for Utility Issues, and submitted briefs.

Andrew J. McBride, Wiley Rein & Fielding, Washington, DC, argued the cause for petitioner Verizon, and submitted briefs. Eve J. Klindera, Wiley Rein & Fielding, and William P. Barr, Michael E. Glover, Edward Shakin, and John P. Frantz, Verizon, Arlington, VA, also were on the briefs.

Cheryl A. Leanza and Andrew Jay Schwartzman, Media Access Project, Washington, DC, filed briefs for petitioners Consumer Federation of America, Consumers Union, and Center for Digital Democracy.

John A. Rogovin, Acting General Counsel, and James M. Carr, Counsel, Federal Communications Commission, Washington, DC, argued the cause for respondents Federal Communications Commission and the United States. R. Hewitt Pate, Acting Assistant Attorney General, Catherine G. O'Sullivan and Nancy C. Garrison, Attorneys, United States Department of Justice, Washington, DC, Daniel M. Armstrong, Associate General Counsel, and Harry M. Wingo, Counsel, Federal Communications Commission, also were on the briefs.

Howard J. Symons, Mintz, Levin, Cohn, Ferris, Glovsky, and Popeo, P.C., Washington, DC, argued the cause for intervenors National Cable & Telecommunications Association, AOL Time Warner, Inc., Time Warner Cable, Charter Communications, Inc., and Cox Communications, Inc., and submitted a brief. Tara M. Corvo and Susan S. Ferrel, Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, Daniel L. Brenner, Neal M. Goldberg, and Michael S. Schooler, National Cable & Telecommunications Association, Washington, D.C., David E. Mills and Todd B. Klessman, Dow, Lohnes & Altbertson, PLLC, Washington, D.C., Henk Brands, Paul, Weiss, Rifkind, Wharton & Garrison, Washington, D.C., and Paul Glist, John D. Seiver, Geoffrey C. Cook, and Brian M. Joseph, Cole, Raywid & Braverman, LLP, Washington, DC, also were on the brief.

William H. Sorrell, Attorney General, filed a brief for petitioners-intervenors State of Vermont, Vermont Public Service

Board, and Department of Public Service. Dixie Henry, David B. Borsykowsky, and Peter M. Bluhm also were on the brief.

Michael K. Kellogg, Kellogg, Huber, Hansen, Todd & Evans, P.L.L.C., Washington, DC, filed a brief for respondent-intervenors SBC Communications Inc., BellSouth Corporation, and BellSouth Telecommunications, Inc. Sean A. Lev and Colin S. Stretch, Kellogg, Huber, Hansen, Todd & Evans, Gary L. Phillips and Jeffry A. Brueggeman, SBC Communications, Washington, DC, James D. Ellis and Paul K. Mancini, SBC Communications, San Antonio, Texas, and James G. Harralson and William J. Ellenberg, BellSouth Corporation, Atlanta, GA, also were on the brief.

Jennifer M. Rubin, Sidley Austin Brown & Wood, Washington, DC, filed a brief for intervenor AT & T Corp. David L. Lawson, Virginia A. Seitz, C. and Frederick Beckner, Sidley Austin Brown & Wood, and Mark C. Rosenblum, Lawrence J. Lafaro, and Stephen C. Garavito, AT & T Corp., Bedminster, NJ, also were on the brief.

Robert J. Aamoth, Kelley, Drye & Warren, Washington, D.C., and Mark D. Schneider, Jenner & Block, LLC, Washington, DC, filed a brief for intervenors Counsel for Competitive Telecommunications Association and WorldCom, Inc. Todd D. Daubert, Kelley, Drye & Warren, Marc A. Goldman and Kali N. Bracey, Jenner & Block, and William Single IV, WorldCom, also were on the brief.

Mark C. Carver, Uddo, Milazzo & Beatmann, Metarie, LA, filed a brief for nonaligned intervenor Utility, Cable & Telecommunications Committee of the City Council of New Orleans urging reversal. Frank U. Uddo, Uddo, Milazzo & Beatmann, and William D. Aaron, Jr., Goins Aaron, PLC, New Orleans, LA, also were on the brief.

Elizabeth H. Rader and Jennifer Stisa Granick, Center for Internet & Society, Stanford, CA, filed a brief for amicus curiae American Civil Liberties Union.

Before: CUDAHY,* O'SCANNLAIN, and THOMAS, Circuit Judges.

PER CURIAM Opinion; Judge O'SCANNLAIN and Judge THOMAS, concurring in separate opinions.

## OPINION

PER CURIAM:

We must decide whether our prior interpretation of the Telecommunications Act controls review of the Federal Communications Commission's decision to classify Internet service provided by cable companies exclusively as an interstate "information service."

I

Over half of the households in the United States have Internet connections. *See* U.S. Dept. of Commerce, *A Nation Online: How Americans Are Expanding Their Use of the Internet* at 2 (Feb.2002), *available at* http:// www.ntia.doc.gov/ntia-home/dn/anationonline2.pdf (herein after *"A Nation Online"*).[1] Approximately 80 percent of those connections are "dial-up" connections. Such connections use the wires owned by local telephone companies to connect the user's computer to an Internet Service Provider's ("ISP's") "point of

---

* The Honorable Richard D. Cudahy, Senior United States Circuit Judge for the Seventh Circuit Court of Appeals, sitting by designation.

1. The Commerce Department's figures are as of September 2001. Given that the report notes that the number of people using the Internet had increased by some 26 million in the thirteen months prior to the initiation of the study, it is likely that there has been a substantial increase between 2001 and today.

presence," which in turn is connected to the Internet "backbone." In addition to providing a connection to the Internet, most ISPs also provide services—including email, user support, and the ability to build web pages on the ISP's servers—as well as proprietary content. Customers connecting to the Internet via a traditional narrowband connection have many ISPs to choose from: There are thousands of such providers nationwide. But because of the limitations of the wires connecting the user's computer to the ISP's point of presence, data transmission over them is quite slow and does not afford users the capacity to access streaming video or audio content.[2]

By contrast, residential high-speed (or "broadband") Internet service allows for much faster and easier use of the Internet, including streaming audio and video. As such, it has been called "the holy grail of media companies." Mark A. Lemley & Lawrence Lessig, *The End of End–To–End: Preserving the Architecture of the Internet in the Broadband Era*, 48 UCLA L.Rev. 925, 926 (2001). Currently, there are two principal "pipelines" through which consumers can receive broadband access: digital subscriber lines ("DSL") and cable lines.[3] DSL uses the same copper wires employed in telephone service and dial-up access,[4] while cable modem service uses the net work of coaxial cable employed to transmit television signals. Because the copper wires used for telephone service and coaxial cable used for cable television are already installed in most Americans' homes, telephone and cable companies have been able to deploy broadband Internet access relatively quickly and cheaply. In the case of DSL, an ISP uses equipment located at the telephone company to transmit Internet service to its subscribers. In the case of cable modem service, the connection to the Internet occurs at the "headend," or the origination point for signals in the cable system.[5] In contrast to DSL service, however, where multiple ISPs may compete in the provision of Internet service over the same DSL pipeline, most cable operators either provide Internet service themselves or provide the service in conjunction with ISPs specifically created and owned by the cable operators. Thus, cable-owned or cable-affiliated ISPs—unlike most dial-up

2. Dial-up allows for transfer of data at a rate of 56 kilobits per second (kbps). *See FCC AOL–Time Warner Merger Order,* 16 F.C.C.R. 6547, 6551 n. 11, 2001 WL 55636 (2001). Cable modem service can transmit data at a rate of up to 10 megabits per second (mbps). Thus while dial-up moves thousands of bits per second, broadband moves millions.

3. There are two other types of high-speed Internet access available—satellite and fixed wireless—but their deployment is very limited: As of 2001, only 3 percent of residential broadband subscribers use these alternative services.

4. For a description of DSL technology, see *WorldCom, Inc. v. FCC,* 246 F.3d 690, 692 (D.C.Cir.2001) ("Packet-switching and digital subscriber line technologies ("DSL") make it possible to send data at high speed over conventional copper wire. Two DSL modems are attached to a telephone loop, one at the

subscriber's premises and one at the telephone company's central office. If the line carries both ordinary telephone service and high-speed data transmission, the carrier must separate these streams at the company's central office, using a digital subscriber line access multiplexer. With this device the carrier sends ordinary voice calls to the public, circuit-switched telephone network (which keeps a phone line open during a voice call) and sends data traffic to a packet-switched data network (which compresses data and can send it in splitsecond bursts during gaps on a line), where it can then be routed to a corporate local area network or Internet service provider ('ISP').")

5. Some cable providers have "super headends" to house data servers, routers, and other Internet-related equipment.

and many DSL ISPs—essentially own the "last mile" (i.e., the connection between the headend and the subscriber's home), giving them the power to restrict other ISPs' access to cable subscribers.

High-speed Internet service via DSL or cable modem is available to approximately 75 percent of households. *See Inquiry Concerning High–Speed Access to the Internet Over Cable and Other Facilities,* 17 F.C.C.R. 4798, 4803 (2002), *available at* 2002 WL 407567 (hereinafter "Declaratory Ruling"). And while only eleven percent of all households subscribe to a broadband Internet service, residential use of high-speed, broadband service is increasing. *See A Nation Online* at 2. Approximately 70 percent of residential broadband subscribers receive their broadband service via cable modem. Declaratory Ruling at 4803.

Congress has addressed the burgeoning market for advanced computer services in the Telecommunications Act of 1996, Pub.L. 104–104, 110 Stat. 56, through which it sought to provide a "pro-competitive, de-regulatory national policy framework" designed to promote the "deployment of advanced telecommunications and information technologies to all Americans by opening all telecommunications markets to competition." H.R. Conf. Rep. No. 104–458, at 113 (1996). To that end, the statute maintained significant common carrier obligations on providers of "telecommunications services" but left providers of "information services" subject to much less stringent regulation.

This distinction tracked a series of prior administrative decisions by the FCC. Beginning in 1980, the FCC distinguished "basic" telecommunications services from "enhanced" information services in the belief that ensuring access to the former would encourage competition in the latter and provide consumers with a wider variety of information services. *In the Matter of Section 64.702 of the Comm'n's Rules & Regulations (Second Computer Inquiry),* 77 F.C.C.2d 384, 417, 0080 WL 233301 (1980). The 1996 law raised the question of whether the new broadband internet technologies qualified as telecommunications services, information services, or a combination of the two.

The FCC did not initially take a position on the regulatory classification of cable modem service. A number of federal courts, however, construed the statute in the context of challenges to other local or federal regulatory decisions. In *AT & T v. City of Portland,* 216 F.3d 871 (9th Cir. 2000), we reviewed the open access conditions a local franchise authority had placed on the sale of a cable franchise. As discussed in detail below, we held that cable modem service did not qualify as a "cable service" and that it contained both information service and telecommunications service components. As a result, the local franchise authority could not impose conditions on the sale. At approximately the same time, a court in the Eastern District of Virginia invalidated a local ordinance that imposed open access requirements on cable modem service, concluding that cable modem involved a telecommunications component and that it also qualified as cable service. *MediaOne Group, Inc. v. County of Henrico,* 97 F.Supp.2d 712, 714–15 (E.D.Vir.2000), *aff'd,* 257 F.3d 356 (4th Cir.2001). *See also Gulf Power Co. v. FCC,* 208 F.3d 1263, 1277 (11th Cir.2000), *rev'd,* 534 U.S. 327, 122 S.Ct. 782, 151 L.Ed.2d 794 (2002) (holding that the FCC could not regulate pole attachments for internet services because they did not qualify as telecommunications services).

In part as a response to these decisions, the FCC on September 28, 2000 issued a notice of inquiry, *In the Matter of Inquiry Concerning High–Speed Access to the Internet Over Cable and Other Facilities,* 15

F.C.C.R. 19287 (2000), *available at* 2000 WL 1434689 (hereinafter "NOI"). In the NOI, the FCC announced its intention "to determine what regulatory treatment, if any, should be accorded to cable modem service and the cable modem platform used in providing this service." *Id.* at 19287. Specifically, the FCC requested comment on whether it should classify "the cable modem platform as a cable service[6] subject to Title VI [of the Communications Act]; as a telecommunications service[7] under Title II; as an information service[8] subject to Title I; or some entirely different or hybrid service subject to multiple provisions of the Act." *Id.* at 19293. In requesting comment, the FCC noted that "[i]t is particularly important to develop a national legal and policy framework in light of recent federal court opinions that have classified cable modem service in varying manners." *Id.* at 19288.

On March 15, 2002, after receiving some 250 comments and meeting with a variety of industry representatives, consumer advocates, and state and local government officials regarding the NOI, the FCC issued its Declaratory Ruling along with a notice of proposed rulemaking ("NPRM"). In the Ruling, the Commission concluded that "cable modem service, as it is currently offered, is properly classified as an in-terstate information service, not as a cable service, and that there is no separate offering of telecommunications service." Declaratory Ruling, 17 F.C.C.R. at 4802. The FCC's classification of cable modem service, if upheld, would mean that, to the extent they provide such service, cable operators would be subject to regulation not as cable service providers under Title VI of the Act, 47 U.S.C. § 521 *et seq.*, nor as common carriers under Title II, § 201 *et seq.*, but rather as providers of an information service under the less stringent provisions of Title I, § 151 *et seq.* Accordingly, in the NPRM that accompanied the NOI, the Commission sought to "address the regulatory implications of [its] decision." 17 F.C.C.R. at 4839. Specifically, FCC requested comments regarding (1) the implications of the classification for the Commission's parallel rulemaking with respect to DSL service;[9] (2) the scope of the Commission's jurisdiction to regulate cable modem service, including whether there are any constitutional limitations on the exercise of that jurisdiction; (3) the need, if any, to require cable operators to provide access to competing ISPs; (4) the effects of the regulatory classification on the marketplace for and the continued deployment of broadband service; (5) "the role of state and local franchising authori-

---

6. "Cable service" is defined in the Act as:
    (A) the one-way transmission to subscribers of (i) video programming, or (ii) other programming service, and
    (B) subscriber interaction, if any, which is required for the selection or use of such video programming or other programming service.
47 U.S.C. § 522(6).

7. The Act defines "telecommunications service" as "the offering of telecommunications for a fee directly to the public, or to such classes of users as to be effectively available directly to the public, regardless of the facilities used." 47 U.S.C. § 153(46).

8. "Information service" is defined as

the offering of a capability for generating, acquiring, storing, transforming, processing, retrieving, utilizing, or making available information via telecommunications, and includes electronic publishing, but does not include any use of any such capability for the management, control, or operation of a telecommunications system or the management of a telecommunications service.
47 U.S.C. § 153(20).

9. *See Appropriate Framework for Broadband Access to the Internet over Wireline Facilities,* 17 F.C.C.R. 3019 (2002) *available at* 2002 WL 252714.

ties in regulating cable modem service"; and (6) "the relationship between our classification determination and statutory or regulatory provisions concerning pole attachments, universal service, and the protection of subscriber policy." *Id.* at 4839–40.

Seven different petitions for review of the Commission's ruling were filed in the Third, Ninth, and District of Columbia Circuits. None of the petitioners challenge the FCC's conclusion that cable modem service is an information service. Rather, each contends that the Commission should not have stopped there—that is, that the Commission should have made an *additional* determination. The first group of petitioners [10] argues that cable modem service is both an information service and a telecommunications service, and is therefore subject to regulation on a common-carriage basis.[11] The second group of petitioners [12] asserts that cable modem service is both an information service and a cable service, and therefore is subject to regulation by local authorities as provided in the Act. The final petitioner, Verizon, advances a third variation on the "the FCC did not go far enough" theme, arguing that the Commission was correct to classify cable modem service as solely an information service, but should have taken the additional step of conferring the same designation on the DSL service provided by telephone companies.

On April 1, 2002, the Judicial Panel on Multidistrict Litigation transferred the related petitions for review to this court for consolidation with Brand X's petition.

## II

Normally, when we review an agency's interpretation of the statute it is charged with administering, we apply the two-step formula set forth by the Supreme Court in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). The reviewing court must look first to the language of the statute: "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842–43, 104 S.Ct. 2778. If the statute is silent or ambiguous, "the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843, 104 S.Ct. 2778. Where the agency's interpretation of the statute is reasonable, the court must defer. *Id.*

That the FCC is the agency Congress has charged with the administration of the Communications Act is beyond cavil. *See* 47 U.S.C. § 151 (establishing the FCC and giving it authority to "execute and enforce the provisions of this chapter"). The FCC, however, is not the only, nor even the first, authoritative body to have interpreted the provisions of the Communications Act as applied to cable broadband service. A prior three-judge panel of this court did precisely that in *Portland.* Petitioners Brand

---

**10.** Advancing this argument are Brand X, EarthLink, the State of California, and the Consumer Federation of America.

**11.** The practical result of such a classification is that cable broadband providers would be required to open their lines to competing ISPs.

**12.** There are two groups of petitioners advancing this argument. The first includes the National League of Cities, the National Association of Tele-communications Officers and Advisors, the United States Conference of Mayors, the National Association of Counties, and the Texas Coalition of Cities for Utility Issues (hereinafter "NLC"). The second group comprises five Pennsylvania townships: Conestoga, Providence, Martic, Buckingham, and East Hempfield (hereinafter "Townships").

X, EarthLink, and the State of California argue that the panel is bound by our court's interpretation of the statute, while the FCC, joined by two of the Petitioners, contends that we are not.

Before we can address the substance of these arguments, however, we must discuss our *Portland* decision in some detail.

### A

*AT & T v. City of Portland* arose out of the merger between AT & T, then the nation's largest long-distance provider, and Telecommunications, Inc. ("TCI"), one of the largest cable television operators and also, in some areas of the country, a provider of cable broadband service.

In order to complete the merger, the two companies had to secure the approval of three different governmental bodies: the Justice Department, the FCC, and the local cable franchising authorities in the City of Portland and Multnomah County. While the federal authorities ultimately assented to the merger, securing the approval of the local authorities proved more difficult. The Communications Act gives local franchising boards the right to approve any sale or transfer of a cable franchise when such approval was required by the local franchising agreement. *See* 47 U.S.C. § 537. TCI's franchise agreements with Portland and Multnomah County gave the local franchising boards the power to " 'condition any Transfer upon such conditions, related to the technical, legal, and financial qualifications of the prospective party to perform according to the terms of the Franchise, as it deems appropriate.' " *Portland*, 216 F.3d at 875. Concerned that AT & T might shut out competing ISPs by restricting cable broadband access to its own proprietary ISP, Portland and Multnomah County—pursuant to their authority under the franchise agreements—sought to condition AT & T's acquisition of the cable franchises upon the provision of open access to its cable broadband network for competing ISPs. AT & T filed suit claiming that the local franchise authorities lacked the power to impose such a condition. The district court granted summary judgment to Portland and AT & T appealed to this court.

"Because Portland premised its open access condition on its position that [cable modem service] is a 'cable service' governed by the franchise," *id.* at 876, we first looked to the statutory definition of "cable service." Noting that the "[t]he essence of cable service [as defined in the Act] . . . is one-way transmission of programming to subscribers generally," we concluded that "the definition does not fit" cable modem service, whose salient characteristics are "not one-way and general, but interactive and individual." *Id.* Because cable modem service was not a cable service under the terms of the Act, we held that "Portland may not directly regulate[it] through its franchising authority." *Id.* at 877.

Having determined that "a cable operator may provide cable broadband Internet access without a cable service franchise," we then turned to the issue of "whether Portland may condition AT & T's provision of standard cable service upon its opening access to the cable broadband network for competing ISPs." *Id.* In order to resolve this issue, we found it necessary to "determine how the Communications Act defines [cable broadband service]." *Id.* We quote our analysis in full:

> Under the statute, Internet access for most users consists of two separate services. A conventional dial-up ISP provides its subscribers access to the Internet at a "point of presence" assigned a unique Internet address, to which the subscribers connect through telephone lines. The telephone service linking the user and the ISP is classic "telecommunications," which the Communi-

cations Act defines as "the transmission, between or among points specified by the user, of information of the user's choosing, without change in the form or content of the information as sent and received." 47 U.S.C. § 153(43). A provider of telecommunications services is a "telecommunications carrier," which the Act treats as a common carrier to the extent that it provides telecommunications to the public, "regardless of the facilities used." 47 U.S.C. §§ 153(44) & (46).

By contrast the FCC considers the ISP as providing "information services" under the Act, defined as "the offering of a capability for generating, acquiring, storing, transforming, processing, retrieving, utilizing, or making available information via telecommunications." 47 U.S.C. § 153(20) (1996). As the definition suggests, ISPs are themselves users of telecommunications when they lease lines to transport data on their own networks and beyond on the Internet backbone. However, in relation to their subscribers, who are the "public" in terms of the statutory definition of telecommunications service, they provide "information services," and therefore are not subject to regulation as telecommunications carriers.

. . .

Like other ISPs, [AT & T's cable broadband service] consists of two elements: a "pipeline" (cable broadband instead of telephone lines), and the Internet service transmitted through that pipeline. However, unlike other ISPs, [the cable broadband provider] controls all of the transmission facilities between its subscribers and the Internet. To the extent [a cable broadband provider] is a conventional ISP, its activities are that of an information service.

However, to the extent that [a cable operator] provides its subscribers Internet transmission over its cable broad-

band facility, it is providing a telecommunications service as defined in the Communications Act.

*Id.* at 877–78. *Cf. Nat'l Cable & Telecomms. Ass'n v. Gulf Power Co.*, 534 U.S. 327, 352 n. 4, 122 S.Ct. 782, 151 L.Ed.2d 794 (2002) (Thomas, J., concurring in part and dissenting in part) (describing high-speed Internet access as requiring "two separate steps," transmission from the consumer to the ISP's point of presence and the connection between the ISP's point of presence and the Internet, and recognizing that the FCC had not yet classified the first, transmission step in the cable context.).

Because we found that the transmission element of cable broadband service constitutes telecommunications service under the terms of the Communications Act—and because the Act provides that "[a] franchising authority may not impose any requirement under this title that has the purpose or effect of prohibiting, limiting, restricting, or conditioning the provision of a telecommunications service by a cable operator," 47 U.S.C. § 541(b)(3)(B)—we concluded that Portland and Multnomah county were barred from conditioning the franchise transfer upon AT & T's provision of open access to its broadband network. *Portland*, 216 F.3d at 878–79.

**B**

As an initial matter, we must reject the implication—or, in the case of petitioner NLC the assertion—that we did not have to confront the regulatory classification of cable modem service in *Portland*, and that, as a result, our discussion of that issue is *dicta*. Such an assertion can be squared neither with our holding in *Portland* nor with our own precedent. First, we note that in the course of determining whether § 541(b)(3) barred the imposition of any conditions on the sale there at issue, the

*Portland* court explained that "we *must* determine how the Communications Act defines [cable modem]." *Portland,* 216 F.3d at 877 (emphasis added). And the concluding paragraph of our *Portland* opinion begins: "We *hold* that subsection 541(b)(3) prohibits a franchising authority from regulating cable broadband Internet access, *because* the transmission of Internet service to subscribers over cable broadband facilities is a telecommunications service under the Communications Act." *Id.* at 880 (emphasis added). In light of this rather unequivocal language, it cannot be gainsaid that we considered the regulatory classification of broadband service an essential element of our decision, and thus part of our holding. Our treatment of the issue, therefore, does not meet the definition of *dicta. See Best Life Assurance Co. v. Comm'r,* 281 F.3d 828, 834 (9th Cir.2002) (defining *dictum* as "a statement 'made during the course of delivering a judicial opinion, but one that is unnecessary to the decision in the case and therefore not precedential ...' ") (quoting *Black's Law Dictionary* 1100 (7th ed.1999)).

Even were we to assume *arguendo* that the FCC and petitioners are correct in asserting that we did not have to reach the issue of cable broadband's classification under the Act, it is clear from our holding that we did, in fact, reach the issue. "As we have noted before, where a panel confronts an issue germane to the eventual resolution of the case, and resolves it after reasoned consideration in a published opinion, that ruling becomes the law of the circuit, regardless of whether doing so is necessary in some strict logical sense." *Miranda B. v. Kitzhaber,* 328 F.3d 1181, 1186 (9th Cir.2003) (per curiam) (internal quotation marks omitted).

It remains for us to determine what effect, if any, the FCC's subsequent interpretation of the Communications Act, as set forth in its Declaratory Ruling, has upon the continuing vitality of our holding in *Portland.*

## C

■ It is well established in this and other federal courts of appeals that three-judge panels are bound by the holdings of earlier three-judge panels. *See United States v. Camper,* 66 F.3d 229, 232 (9th Cir.1995); *Indus. Turnaround Corp. v. NLRB,* 115 F.3d 248, 254 (4th Cir.1997) ("A decision of a panel of this court becomes the law of the circuit and is binding on other panels unless it is overruled by a subsequent en banc opinion of this court or a superseding contrary decision of the Supreme Court.") (internal quotation marks omitted).

■ In addition to the obvious exceptions to this rule, *see, e.g., In re Watts,* 298 F.3d 1077, 1084 (9th Cir.2002) (O'Scannlain, J., concurring) ("We need not convene the en banc court when the Supreme Court reverses us directly. Nor must we do so when that Court, in reviewing a case from another circuit, knocks the props out from under one of our decisions."), our circuit has provided for an exception where our precedent conflicts with a subsequent agency interpretation. In *Mesa Verde Construction Co. v. Northern California District Council of Laborers,* 861 F.2d 1124 (9th Cir.1988) (en banc), we held that "if a panel finds that an[agency] interpretation of [its statute] is reasonable and consistent with the law[ ], the panel may adopt that interpretation even if circuit precedent is to the contrary." *Id.* at 1136. We immediately qualified this holding by stating that the earlier panel decision may be disregarded in favor of the agency interpretation "only where the precedent constituted deferential review of [agency] decisionmaking." *Id.* "If the precedent held either that the [agency] decision was

unreasonable or the only possible interpretation of the statute," then the prior court's construction trumps the agency's interpretation. *Id.*

The FCC argues that because we did not assert in *Portland* that our construction of the statute was the "only possible interpretation of the statute," we ought not be bound by it here, and instead are free to review the agency's interpretation on a clean slate. The FCC, however, ignores *Mesa Verde*'s clear mandate that precedent can be disregarded in favor of a subsequent agency interpretation "only where the precedent constituted deferential review of [agency] decisionmaking." *Mesa Verde*, 861 F.2d at 1136. In *Portland*, we took pains to "note at the outset that the FCC has declined, both in its regulatory capacity and as amicus curiae, to address the issue before us. Thus we are not presented with a case involving potential deference to an administrative agency's statutory construction pursuant to the *Chevron* doctrine." *Portland*, 216 F.3d at 876.

■ Furthermore, while we never explicitly stated in *Portland* that our interpretation of the Act was the only one possible, we never said the relevant provisions of the Act were ambiguous. Thus, *Mesa Verde*'s requirements are not met in this instance and *Portland*'s construction of the Communications Act remains binding precedent within this circuit, even in light of the FCC's contrary interpretation of the statute.

We find further support for this conclusion in the Supreme Court's holding in *Neal v. United States*, 516 U.S. 284, 116 S.Ct. 763, 133 L.Ed.2d 709 (1996). There, the Court was presented with a challenge to a sentence imposed following the appellant's conviction for possession of LSD (lysergic acid diethylamide). Appellant contended that the district court erred in imposing a 10–year sentence pursuant to

the mandatory minimum set forth in the Anti–Drug Abuse Act of 1986, Pub.L. No. 99–570, 100 Stat. 3207, as construed by the Supreme Court in *Chapman v. United States*, 500 U.S. 453, 111 S.Ct. 1919, 114 L.Ed.2d 524 (1991) (holding that for sentencing purposes, under the terms of the mandatory minimum statute, the actual weight of the LSD possessed by the defendant included the blotter paper onto which the drug is placed). The appellant noted that, subsequent to *Chapman*, the Sentencing Commission had revised the Guidelines to establish a "presumptive weight" of 0.4 milligrams for each dose of LSD, and argued that this revision effectively supplanted the rule announced in *Chapman*. In essence, the appellant contended that the revision of the Guidelines by the Commission was an interpretation of the statute the Court construed in *Chapman* and, "because the Commission is the agency charged with interpretation of penalty statutes and expert in sentencing matters," its construction had to be given deference. *Neal*, 516 U.S. at 290, 116 S.Ct. 763.

The Court rejected petitioner's argument, noting first that the Sentencing Commission's commentary was an attempt to revise the Sentencing Guidelines and not an attempt to interpret the penalty statute itself. It continued:

Were we, for argument's sake, to adopt petitioner's view that the Commission intended the commentary as an interpretation of [the statute] ... he still would not prevail. The Commission's [interpretation] cannot be squared with *Chapman*. ... In these circumstances, we need not decide what, if any, deference is owed the Commission in order to reject its alleged contrary interpretation. Once we have determined a statute's meaning, we adhere to our ruling under the doctrine of *stare decisis*, and we assess an agency's later interpreta-

tion of the statute against that settled law.

*Neal,* 516 U.S. at 294–95, 116 S.Ct. 763. Notwithstanding the Supreme Court's use of the term "we," there is nothing to suggest that *Neal*'s rule should apply only when it is the Supreme Court (and not the courts of appeals) construing the statute in question, and the Court itself has never asserted that the power authoritatively to interpret statutes belongs to it alone. *See, e.g., Rivers v. Roadway Express, Inc.,* 511 U.S. 298, 312–13, 114 S.Ct. 1510, 128 L.Ed.2d 274 (1994) ("*[J]udicial* construction of a statute is an authoritative statement of what the statute meant before as well as after the decision of the case giving rise to that construction.") (emphasis added); *accord United States v. Mead Corp.,* 533 U.S. 218, 248–49, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001) (Scalia, J., dissenting) ("I know of no case, in the entire history of the federal courts, in which we have allowed a judicial interpretation of a statute to be set aside by an agency—or have allowed a lower court to render an interpretation of a statute subject to correction by an agency.").[13]

### III

■ Our holding in Mesa Verde, along with that of the Supreme Court in *Neal,* requires our adherence to the interpretation of the Communications Act we an-

nounced in *Portland.* There, we concluded that cable broadband service was not a "cable service" but instead was part "telecommunications service" and part "information service." Because the Commission's Declaratory Ruling agreed with our conclusion that cable broadband service is not "cable service," but disagreed with our conclusion that it is in part "telecommunications service," we must

AFFIRM in part, VACATE in part, and REMAND for further proceedings not inconsistent with this opinion.[14]

O'SCANNLAIN, Circuit Judge, concurring:

I concur in the court's conclusion that, in light of our holding in *Mesa Verde,* we are bound by our own interpretation of the Telecommunications Act in *Portland* and must vacate the FCC's Declaratory Ruling.

I write separately to note that our adherence to *stare decisis,* even in the face of a subsequent agency interpretation contrary to our *Portland* decision, produces a result "strikingly inconsistent with *Chevron*'s underlying principles." Russell L. Weaver, *The Emperor Has No Clothes: Christensen, Mead and Dual Deference Standards,* 54 Admin. L.Rev. 173, 192 (2002); *see also* Richard L. Pierce, Jr., *Reconciling Chevron and* Stare Decisis, 85

---

**13.** The Supreme Court's recent decision in *Nat'l Cable & Telecomms. Ass'n, Inc. v. Gulf Power Co.,* 534 U.S. 327, 122 S.Ct. 782, 151 L.Ed.2d 794 (2002) ("*Gulf Power*"), handed down after our *Portland* decision but before the FCC's Declaratory Ruling, does not compel a different result. There the Court was faced with challenges to FCC orders determining the rents to be paid by cable and telecommunications service providers for the attachment of their wires to utility poles. The Court explicitly noted that the FCC had not yet categorized cable modem service and "address[ed] only whether pole attachments that

carry commingled services are subject to FCC regulation at all." *Id.* at 338, 122 S.Ct. 782.

**14.** Because the various petitioners' claims all revolve around the FCC's central classification decision, which we have vacated, we decline here to consider their remaining claims (including those directed at the validity of the FCC's determination that AOL Time Warner offers cable transmission to unaffiliated ISPs on a private carriage basis and its waiver of the *Computer II* requirements for cable companies who also offer local exchange service), leaving them for reconsideration by the FCC on remand.

Georgetown L.J. 2225, 2260 (1997) (advocating a nuanced approach to conflicts between *stare decisis* and subsequent agency interpretations, and rejecting rigid adherence to precedent).

As Part I of the court's opinion makes clear, the market for Internet services—what we called in *Portland* a "quicksilver technological environment," *Portland*, 216 F.3d at 876—is evolving quite rapidly. Indeed, it is the desire to ensure the continued development of this market—and to further Congress' oft-stated desire that there be broad, nationwide access to broadband Internet service—that drove the FCC to take the action we vacate today.

One can disagree—and indeed the seven petitioners and numerous *amici do* disagree, vigorously—about whether the FCC's regulatory classification of cable modem service would move us closer to or farther away from achieving those important goals. Regardless of one's view of the wisdom of the FCC's declaratory ruling, it cannot be denied that our holding today effectively stops a vitally important policy debate in its tracks, at least until the Supreme Court reverses us or Congress decides to act.[1]

While my belief in the importance of *stare decisis* as a check on judicial power is as staunch as anyone's, *see Miller v. Gammie*, 335 F.3d 889, 901–02 (9th Cir. 2003) (O'Scannlain, J., concurring in part) (noting "the clear authority of the en banc court to do what three-judge panels normally cannot—namely, overrule prior decisions of three-judge panels"), adherence to *stare decisis* in the present case—coming as it does in a decision that determines the outcome of seven different petitions for review from three different circuits consolidated and assigned randomly to this court by the Judicial Panel on Multidistrict Litigation—appears to aggrandize, rather than limit our power over an admittedly complicated and highly technical area of telecommunications law. For, strict adherence to the rule we reaffirm today[2] "appends a subversive codicil to *Chevron*'s rule that Congress gives agencies, rather than courts, 'whatever degree of discretion the ambiguity [of a statute] allows,'—that is, unless courts take it first." Kenneth A. Bamberger, *Provisional Precedent: Protecting Flexibility in Administrative Policymaking*, 77 N.Y.U. L.Rev. 1272, 1273 (2002) (quoting *Smiley v. Citibank (S.D.), N.A.*, 517 U.S. 735, 741, 116 S.Ct. 1730, 135 L.Ed.2d 25 (1996)).[3] Our *Portland* decision, in essence, beat the FCC to the punch, leading to the strange result we are compelled to reach today: three judges telling an agency acting within the area of

---

1. Our decision could suffer a third, decidedly more drastic fate. Given the importance of the regulatory classification of broadband internet service, one wonders whether our decision today will prompt the FCC to follow the example of the Social Security Administration, the National Labor Relations Board, and the Internal Revenue Service, among other federal agencies, in adopting a policy of "nonacquiescence" in the face of court rulings with which the agency disagrees. *See generally*, Samuel Estreicher & Richard L. Revesz, *Nonacquiescence by Federal Administrative Agencies*, 98 Yale L.J. 679 (1989).

2. That is, that three-judge panels can disregard precedent in favor of a subsequent contrary agency interpretation *only* when the earlier court (1) was proceeding in a deferential posture and (2) did not declare that its interpretation of the statute was the *only* possible interpretation. *See* Slip Op. at 1130–1131.

3. The dangerousness of this "codicil to *Chevron*," is made all the more clear in the wake of the Supreme Court's recent decision in *United States v. Mead*, 533 U.S. 218, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001), which "limited the types of agency interpretations that are binding on courts, thereby increasing significantly the frequency with which courts will be able to resolve ambiguity preclusively before an agency can act decisively." Bamberger, *Provisional Precedent, supra* at 1275.

its expertise that its interpretation of the statute it is charged with administering cannot stand—and that *our* interpretation of how the Act should be applied to a "quicksilver technological environment," *Portland,* 216 F.3d at 876, is the correct, indeed the only, interpretation.[4]

Strange as this result may seem, I concur in the court's opinion only because I believe our court's precedent compels it.

THOMAS, Circuit Judge, concurring:

I agree that our prior decision in *AT & T v. City of Portland,* 216 F.3d 871 (9th Cir.2000), controls the statutory interpretation question and requires a remand. I write separately to underscore my conclusion that *City of Portland* was correctly decided. Considered in its entirety, the 1996 Telecommunications Act compels the conclusion that cable modem contains a telecommunications service component.

### A

This is not a case that implicates *Chevron* deference, not only for the reasons noted in our unanimous opinion, but also because it is a question of pure statutory interpretation. In reviewing an administrative agency's construction of the statute it administers, we must consider first "whether Congress has directly spoken to the precise question at issue." *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 842, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). "If Congress has

done so, the inquiry is at an end; the court 'must give effect to the unambiguously expressed intent of Congress.'" *Food and Drug Administration v. Brown & Williamson Tobacco Corp.,* 529 U.S. 120, 132, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000) (quoting *Chevron,* 467 U.S. at 843, 104 S.Ct. 2778). In making that assessment, we look not only at the statutory section in question, but also analyze the provision in the context of the governing statute as a whole, *see id.* at 132, 120 S.Ct. 1291, presuming congressional intent to create a "'symmetrical and coherent regulatory scheme.'" *Id.* at 133, 120 S.Ct. 1291 (quoting *Gustafson v. Alloyd Co.,* 513 U.S. 561, 569, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995)). If, after conducting such an analysis, we conclude that Congress has not addressed the issue, that is, that "'the statute is silent or ambiguous'—we proceed to the second step, where we decide whether the agency's interpretation 'is based on a permissible construction of the statute.'" *Pacheco–Camacho v. Hood,* 272 F.3d 1266, 1268 (9th Cir.2001) (quoting *Chevron,* 467 U.S. at 843, 104 S.Ct. 2778). In short, if our analysis indicates that the statute is silent or ambiguous, we "must respect the agency's construction of the statute so long as it is permissible." *Brown & Williamson,* 529 U.S. at 134, 120 S.Ct. 1291 (citing *INS v. Aguirre–Aguirre,* 526 U.S. 415, 424, 119 S.Ct. 1439, 143 L.Ed.2d 590 (1999)).

---

**4.** Aside from the incongruity of the result in the instant case, the broader implications of the rule we apply today are quite dramatic. Foremost among them, as Justice Scalia noted in his dissent in *Mead,* is the potential for the ossification of large portions of our statutory law.... Once the court has spoken, it becomes *unlawful* for the agency to take a contradictory position; the statute now *says* what the court has prescribed.... It will be bad enough when this ossification occurs as a result of judicial determination (under

today's new principles) that there is no affirmative indication of congressional intent to "delegate"; but it will be positively bizarre when it occurs simply because of an agency's failure to act by rulemaking (rather than informal adjudication) before the issue is presented to the courts.
*Mead,* 533 U.S. at 246, 121 S.Ct. 2164 (Scalia, J., dissenting). This case, it seems to me, presents precisely the "positively bizarre" scenario envisioned by Justice Scalia.

In *City of Portland*, we engaged in this analytical exercise and concluded that Congress meant what it said in defining "telecommunications." We did not discern any ambiguity in the statutory meaning for the agency to interpret; thus, *Chevron* deference would have been inappropriate even if the agency had interpreted the statute prior to *City of Portland*. As the Supreme Court stated in *Barlow v. Collins*, 397 U.S. 159, 166, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970): "[When] the only or principal dispute relates to the meaning of the statutory term, the controversy must ultimately be resolved, not on the basis of matters within the special competence of the [agency], but by judicial application of canons of statutory construction." As the Supreme Court has emphasized, "[t]he judiciary is the final authority on issues of statutory construction." *INS v. Cardoza–Fonseca*, 480 U.S. 421, 447, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987) (quoting *Chevron*, 467 U.S. at 843 n. 9, 104 S.Ct. 2778).

Our role in statutory interpretation is necessarily different from that of an agency's. As Judge Kozinski has explained:

But in performing their proper function, judges must listen for the voice of the legislature, not to the sound of their own heartbeats. Because courts are bound by the best construction of the statute, they may alter their interpretation only in response to a powerful new insight as to the law's meaning, not because a different panel of judges prefers a different result.

Agencies, on the other hand, may turn on a dime: Their proper function is to fill in policy gaps pursuant to an explicit or implicit delegation of authority from Congress. *See, e.g., Morton v. Ruiz*, 415 U.S. 199, 231, 94 S.Ct. 1055, 1072, 39 L.Ed.2d 270 (1974) ("[t]he power of an administrative agency to administer a congressionally created ... program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress"). Where Congress has delegated such authority, the statute becomes a clear vessel which changes its tint as it is filled and refilled by various policy pigments. Because the agency administering the statute is not bound to a single formulation of statutory language, it may make changes without considering whether the new approach more accurately reflects the meaning of the statute.

*Mesa Verde Constr. Co. v. N. Cal. Dist. Council of Laborers*, 861 F.2d 1124, 1146–47 (9th Cir.1988) (en banc) (Kozinski, J., dissenting).

Thus, once we have fulfilled our judicial function in interpreting an act of Congress and have determined the meaning is clear, the subsequent action of an agency cannot and should not alter our conclusion. If it did, then case law would be in a constant state of uncertainty, awaiting a new interpretation by an agency.

That being said, given the present context, it is appropriate to explain why I believe the interpretation of *City of Portland* was correct.

### B

As noted in both *City of Portland* and our opinion today, Internet access involves two separate services: an information service that provides e-mail, web browsing, and other means of manipulating information, and a telecommunications "pipeline" that transmits the actual data. The statute defines and regulates these two components separately, in accordance with the historic distinction between basic and enhanced services. 47 U.S.C. § 153(20), (46). Although this differential is more apparent when two different companies are involved, the same statutory framework applies when a single company provides the two services.

Telecommunications means "the transmission, between or among points specified by the user, of information of the user's choosing, without change in the form or content of the information as sent and received." 47 U.S.C. § 153(43). Everyone agrees that cable modem users will have the capacity to send and receive email and download pre-existing content from websites. These activities involve, at least in part, the transmission of "information of the user's choosing" without any change in form or content by the cable company. Naturally, integrated cable modem services also offer subscribers the "capability" for "generating, acquiring, storing, ... [and] retrieving" this information through email software, web browsers, and the like, activity that clearly falls within the definition of "information service." 47 U.S.C. § 153(20). However, under the statutory definition, the "information service" includes only the "capability" to generate, transmit, and receive email and information "via telecommunications." The *actual transmission*, that is, putting this *capability* into practice, falls outside the definition and requires additional "telecommunications." [1]

The FCC acknowledges that cable modem service must be provided "via telecommunications" but insists that cable modem does not involve "telecommunications service" because it does not involve the "offering of telecommunications for a fee directly to the public." 47 U.S.C. § 153(46). Rather, the agency suggests, customers purchase an integrated package of services that may include telecommunications but does not include telecommunications service. In other words, the agency places a great deal of weight on the distinction between "telecommunications" and "telecommunications service." However, the full statutory definition, the overall legislative scheme, and the associated regulatory history clearly indicate that cable modem provides not only telecommunications but also telecommunications service.

Congress defined "telecommunications service" as "the offering of telecommunications for a fee directly to the public, or to such classes of users as to be effectively available directly to the public, regardless of the facilities used." 47 U.S.C. § 153(46). Cable modem subscribers who use the cable company's own information services transmit that information via the telecommunications pipeline offered by the cable company. As the FCC admits, other cable modem subscribers may completely "bypass that company's web browser, proprietary content, and e-mail" and "click through" to another service. *In the Matter of Inquiry Concerning High–Speed Access to the Internet Over Cable and Other Facilities,* 17 F.C.C.R. 4798, 4815, 2002 WL 407567 (2002). Both classes of cable modem subscribers pay a monthly "fee" "directly" to the cable company in order to use "telecommunications." Nothing in the definition suggests that the telecommunications component must be priced or offered separately in order to qualify as a telecommunications service. Under the FCC's approach, the general public would be purchasing a service that nobody offered.

Prior to the decision in this case, the FCC consistently recognized that Internet access implied the separate provision of a telecommunications service by some entity. In the conventional world of dial-up access over "plain old telephone service," the agency classified the Internet Service Provider (ISP) as an information service and

---

**1.** The definition of information service explicitly excludes "any use of such capability for the management, control, or operation of a telecommunications system or the management of a telecommunications service." 47 U.S.C. § 153(20).

the telephone service as a telecommunications carrier. *See, e.g., In the Matter of Federal–State Joint Bd. on Universal Serv.,* 13 F.C.C.R. 11,501, 11,539–40, 1998 WL 166178 (1998). When a local telephone company simultaneously offered Internet access, it was still required to offer the telecommunications services to other ISPs on a common carrier basis. *See, e.g., In the Matter of Bell Operating Cos. Joint Petition for Waiver of Computer II Rules,* 10 F.C.C.R. 13,758, 13,767–68, 1995 WL 637904 (1995) (discussing Pacific Bell's offering of Internet access service and its compliance with unbundling requirements).

Similarly, when the FCC first applied the 1996 law to integrated broadband services, the agency concluded that Internet access via DSL contained both information service and telecommunications service components:

> An end-user may utilize a telecommunications service together with an information service, as in the case of Internet access. In such a case, however, we treat the two services separately: the first service is a telecommunications service (e.g. the xDSL-enabled transmission path), and the second service is an information service, in this case Internet access.

*Deployment of Wireline Servs. Offering Advanced Telecomms. Capability,* 13 F.C.C.R. 24,012, 24,030, 1998 WL 458500 (1998). Thus, the decision by some of the Bell Operating Companies (BOCs) to offer an "integrated" Internet access package did not affect the regulatory classification. Instead, the FCC noted that "BOCs offering information services to end users of their advanced service offerings, such as xDSL, are under a continuing obligation to offer competing ISPs non-discriminatory access to the telecommunications services

utilized by the BOC information services." *Id.* at 24,031. This position reflects a much more reasonable reading of the statute.[2]

Other provisions in the Telecommunications Act buttress the idea that companies may offer telecommunications services even when they also offer other services. First, the Act extends common carrier requirements to every telecommunications carrier (defined as "any provider of telecommunications services"), but "only to the extent that it is engaged in providing telecommunications services." 47 U.S.C. § 153(44). Thus, under the statutory scheme, some "providers of telecommunications services" may simultaneously provide other services, presumably including information services, which would be subject to a separate regulatory regime. Second, as mentioned in *City of Portland,* 216 F.3d at 879, the pole attachment provisions at 47 U.S.C. § 224(d)(3) at least contemplate the possibility that a cable system may provide tele-communications service. *See also Nat'l Cable & Telecomms. Ass'n v. Gulf Power Co.,* 534 U.S. 327, 353–54, 122 S.Ct. 782, 151 L.Ed.2d 794 (2002) (Thomas, J., concurring in part and dissenting in part) (arguing that because the FCC had not yet classified cable modem service, it could not yet regulate the pole attachment rates).

Third, Congress instructed the FCC and state commissions "with regulatory jurisdiction over telecommunications services" to use their regulatory powers in order to encourage the deployment of "advanced telecommunications capability." Telecommunications Act of 1996, Pub.L. No. 104–104, Title VII, § 706(a), 110 Stat. 56, 153 (1996). The Act defined this "advanced telecommunications capability" as "high speed, switched, broadband telecommuni-

---

**2.** The agency has now decided to reconsider its treatment of DSL broad-band service. *In the Matter of Appropriate Framework for* *Broadband Access to the Internet Over Wireline Facilities,* 17 F.C.C. Rcd. 3019, 2002 WL 252714 (2002).

cations capability that enables users to originate and receive high-quality voice, data, graphics, and video telecommunications using any technology," *Id.* at § 706(c)(1), an apt description of cable modem service. Although this section does not explicitly state that the "telecommunications capability" inherent in cable modem must include a "telecommunications service," the state and federal regulatory powers referenced in this section have traditionally been applied to basic transmission services rather than enhanced information services. *See, e.g., In the Matter of Section 64.702 of the Comm'n's Rules & Regulations (Second Computer Inquiry),* 77 F.C.C.2d. 384, 431–33, 0080 WL 233301 (1980) (noting the FCC only had authority over enhanced services under the general provisions of Title I and refraining from imposing regulations).[3] This suggests that Congress intended some component of the "advanced telecommunications capability" to be subject to the Title II powers governing telecommunications services.

Turning to the law as a whole, the 1996 Act was designed to accelerate the private sector deployment of advanced telecommunications and information technologies "by opening all telecommunications markets to competition." H.R. Conf. Rep. No. 104–458 at 113; *see also* Stuart Minor Benjamin, et al., *Telecommunications Law and Policy* 716 (2001) (noting that the 1996 Act was designed in part to increase competition in telecommunications markets and promote increased access to advanced telecommunications services). As we recognized in *City of Portland,* the Act mandates "a network architecture that prioritizes consumer choice, demonstrated by vigorous competition among telecom-

munication carriers." *City of Portland,* 216 F.3d at 879. In order to foster this competition, the 1996 Act applies the traditional common carrier obligations of non-discrimination and interconnectivity to telecommunications service providers "regardless of the facilities used." 47 U.S.C. § 153(46). Application of these principles to cable modem service would enhance independent ISP access to telecommunications facilities, almost certainly increasing consumer choice. Naturally, the FCC may choose to forbear from enforcing these regulations if it determines they are not necessary to promote competition or protect consumers. 47 U.S.C. § 160(a)-(b).[4] Nonetheless, the Act creates a general presumption in favor of opening markets to competition.

The evolution of advanced telecommunications regulation prior to the 1996 Act reflects the same underlying belief that widespread access to "basic" transmission facilities would spur competition in "enhanced services" and provide consumers with a wider variety of more closely tailored products. *See, e.g., Second Computer Inquiry,* 77 F.C.C.2d at 417. Under this *"Computer II"* framework, the FCC subjected basic transmission services to common carrier regulations and left enhanced services largely unregulated. Companies that owned transmission facilities and offered both basic and enhanced services were required to separate out the basic transmission component and offer it to all providers of enhanced services, subject to the interconnectivity and non-discrimination requirements of Title II. *In the Matter of Indep. Data Communications Mfrs. Ass'n,* 10 F.C.C.R. 13,717, 13,719, 1995 WL 613619 (1995).

---

**3.** As discussed below, Congress incorporated a similar distinction into the structure of the 1996 Act.

**4.** The FCC argued in its brief that sufficient competition exists across broadband technol-

ogies, though several petitioners argued vigorously that many subscribers, especially in rural areas, do not have access to broad-band alternatives such as DSL.

These decisions formed the regulatory background for the 1996 Act, in which Congress created the new, corresponding categories of "information services" and "telecommunication services." The FCC previously acknowledged that Congress intended the categories in the 1996 Act to "parallel" those developed through the *Computer II* decisions:

> Reading the statute closely, with attention to the legislative history, we conclude that Congress intended these new terms to build upon frameworks established prior to the passage of the 1996 Act. Specifically, we find that Congress intended the categories of "telecommunications service" and "information service" to parallel the definitions of "basic service" and "enhanced service" developed in our *Computer II* proceedings....

*Universal Service*, 13 F.C.C.R. at 11,511. Thus, the background regulatory regime required that a bundled package of enhanced services and basic services be separated out and subjected to different requirements. Given this context, the Congressional decision to create "parallel" categories in the new statute creates a presumption in favor of similar treatment for information and telecommunications services.

The specific legislative history of "telecommunications service" provides additional support for the idea that cable modem incorporates a telecommunications service. The House report on its version of the bill implied that "telecommunications service" was distinguished from "telecommunications" largely in order to exclude internal, privately provided telecommunications networks. *See* H.R.Rep. No. 104–204, at 126 ("By defining 'telecommunications service' as those services and facilities offered on a 'common carrier' basis, the Committee recognizes the distinction between common carrier offerings that are provided indifferently to the public or to such classes of users as to be effectively available to a substantial portion of the public, and private services."). The Senate report explained that its definition of "telecommunications" excluded "services involving interaction with stored information, that are defined as information services. The underlying transport and switching capabilities on which these information services are based, however, are included in the definition of 'telecommunications services.'" S.Rep. No. 104–23, at 18. The report also stated that "'[t]elecommunications service' does not include information services, cable services, or 'wireless' cable services, but does include the transmission, without change in the form or content, of such services." *Id.* Thus, both Houses implied that sale to the public of a service allowing the unaltered transmission of information qualified as a telecommunications service.[5] Although Congress intended information services and telecommunications services to be mutually exclusive under both definitions, *see Universal Service*, 13 F.C.C.R. at 11,522–23, nothing suggests that telecommunications service ceased to be so when offered to the public along with an information service.

The FCC responds that it has already ruled that the mere transmission of unal-

---

5. In forging compromise language, the conference committee adopted the general definition of telecommunications service from the Senate bill but deleted the second sentence, "[t]he term includes the transmission, without change in the form or content, of information services of cable services, but does not include the offering of those services." The conference report does not specify why this sentence was deleted, H.R. Conf. Rep. No. 104–458, at 117 (1996), though the FCC later concluded that it had been deleted in order to avoid treating broadcasters and cable systems as telecommunications carriers. *Universal Service*, 13 F.C.C.R. at 11,523.

tered data does not imply that an information service contains a telecommunications service component. *Universal Service*, 13 F.C.C.R at 11,538–39 (1998). According to this 1998 decision,

> The provision of Internet access service involves data transport elements: an Internet access provider must enable the movement of information between customers' own computers and the distant computers with which those customers seek to interact. But the provision of Internet access service crucially involves information-processing elements as well; it offers end users information-service capabilities inextricably intertwined with data transport. As such, we conclude that it is appropriately classed as an "information service."

*Id.* at 11,539–40. Critically, however, the Internet service providers at issue in the report "typically own no telecommunications facilities. Rather, in order to provide those components of Internet access services that involve information transport, they lease lines, and otherwise acquire telecommunications, from telecommunications providers...." *Id.* at 11,540. That is, *someone* still has to provide telecommunications service, even though the ISP's resale of this service to the public does not transform the ISP into a telecommunications service provider.[6] In the integrated cable modem context, the same company provides these two, entirely separate services.

Finally, the FCC complains that the interpretation required by *City of Portland* would require it to "find a telecommunications service inside every information service." However, as mentioned, the agency never arrived at this result for dial-up ISPs who either purchased telecommunica-

tions services from others or relied upon users to access the ISP through conventional phone lines. *Universal Service*, 13 F.C.C.R. at 11,539. Information services provided by ISPs who purchased telecommunications services from cable companies should be subject to the same regulatory regime. *See, e.g., Indep. Data Communications*, 10 F.C.C.R. at 13,719–20 (1995) (holding that non-facilities-based carriers who offered both enhanced services and basic transmission would be treated as if they only offered enhanced services). The FCC has not demonstrated that cable modem differs in any way that would preclude similar treatment.

In my view, the statutory definitions, combined with the overall regulatory and legislative context, compel the result that cable modem service includes a telecommunications service component. Thus, even if we were writing on a clean slate, my conclusion would be the same as the one we reached in *City of Portland* as to the meaning of the statute.

---

**6.** A telecommunications carrier selling broadband transmission service to ISPs in effect offers telecommunications "to such classes of users as to be effectively available directly to the public" and thus provides "telecommunications service" under 47 U.S.C. § 153(46).